By the Court.
If you [the prisoner] were there, why then I think that everything that transpired upon that occasion, and every material of evidence that is found there, would be admissible here by way of illustrating the character of the transaction. If the people fail in the subsequent evidence to make the connecting link, or if the evidence shall be so light and unreliable as not to be a sufficient foundation for a verdict, the jury will disregard it. They must find the prisoner guilty beyond a reasonable doubt. All that is to be determined in the ultimate disposition of the case under the charge of the court to the jury. If they fail in showing this connecting link, the court will give you the benefit of it in the final result.
Hopkins, to establish the identity of the drowned men with certain persons named Dexter, alias Davenport, and Jarvis, asked a witness, after he had testified to having seen Davenport on a previous occasion—
Have you seen, through the aid of a glass, a picture taken of the drowned men ?
[Objected to.]
Hoplcins offered to prove that one of these men was the same Davenport who was afterwards drowned, and whose likeness was shown.
[Objected to, on the ground,—
First. That it was premature ;
Second. That it was immaterial, irrelevant, and incompetent.
*252 Third. That the likeness was the substitution of one fact for another, and not allowable in criminal practice.
The Court.—I don’t know ; they could not keep the dead men above ground.
Fourth. That the witness would not be speaking from facts which had fallen directly under his own observation.
Fifth. That his testimony would be mere matter of opinion; and that these photographs were not taken until after these bodies had lain in the water two days and a night, and not until the next day.following the time they were taken out of the water, and had become swollen and bloated and disfigured.]
Tibe Court.—I think the evidence is admissible.
The coroner who held the" inquest upon the bodies of drowned men, and who, on that inquest, had examined the prisoner, was called as a witness, and stated the examination of the prisoner. The coroner was then asked as follows: “ Did you say to the prisoner that if he would tell you any man within the State that knew of him (the prisoner), and would explain his whereabouts, you would send after that man and bring him before the coroner, at the expense of the county.
[Objected to as immaterial.]
The Court.—I do not think it immaterial, and it is part of the transaction that occurred there at that time.
[Objection overruled, exception taken.]
Q. “ Did he say that he had no money ? ”
“Yes, he said he had not money enough to carry him through.”
A police ofiicer was called- who testified that he went to Ruloff’s last place of residence in the city of Yew York, and learned that Ruloff had been absent from there about six weeks ; that he searched the house and Ruloff’s apartments, and removed the contents of a *253 secretary or desk there found. To the question what he found in this secretary, he replied:
“I found two or three skeleton keys, one or two lock picks, a racket drill for boring, with places to put in bits, a portion of a saw used for cutting iron, a dark lantern and a vice.”
[Objected to.]
The Court.—I think I did say before that some of these articles, were scarcely admissible, but I have a little doubt as to whether I decided rightly at that time; of course, some of the instruments were plainly admissible, for instance, some of the bits and braces which were fonnd there, and which were similar to those found upon the person of one of the dead men; but part of them being in on evidence, I am rather inclined to think the whole may be.
[Objection overruled, exception taken.]
The same objection was afterwards taken to the introduction of certain newspaper slips found in the same place.
Drs. Bassett and Thayer, who had been called and examined for the people and had been cross-examined, were, after the taking of other testimony, called by the prisoner’s counsel, but did not respond or come forward, whereupon the counsel for the prisoner moved that the evidence of these witnesses be stricken from the case.
The Court.—What do you wish to prove by these witnesses %
Becker.—That the hair of this murdered man was not scorched and burnt, and that therefore the pistol could not have been held close to his head.
The Court.—The motion cannot be granted. In the first place, these witnesses have not been examined as to this fact when on the stand. In the next, pains have not been taken to procure their attendance at this time, and they had probable reason to suppose they were not *254 wanted further. In the next place, the evidence tends to show already that the hair of this young man (Mirrick) was not scorched. Ido not see that the evidence of the physicians would add anything to the strength of the uncontradicted testimony upon that subject, and therefore, them testimony is immaterial.
Beefier.—Will the prosecution concede that ?
The Court.—It has been proved by one witness, I think, Mr. Halbert, that he did not see anything like scorched hair. I deem the evidence offered immaterial, and, therefore, the motion to strike out the former evidence of these men is denied.
[Exception taken.]
Beefier here moved for an acquittal, since it appeared that the killing of Mirrick was not murder or manslaughter as charged in the indictment, but at most only a special form of manslaughter in the second degree, under the statute;—“Every person who shall unnecessarily kill another, either—
1. While resisting an attempt by such other person to commit any felony, or to do any other unlawful act; or,
2. After such attempt shall have failed ;
Shall be deemed guilty of manslaughter in the second degree” (3 Rev. Stat., 5 ed., 661, § 11).
And because no count in the indictment charged an unnecessary killing, under the statute, or upon which the trial could proceed.
The court decided that upon the indictment the prisoner could be lawfully convicted of manslaughter under the statute referred to, and denied the motion.
To identify Dexter, alias Davenport, a photograph was produced. The photographer testified as follows :
Question.—“These are just as they were taken out and set up against the barn % ”
“Yes, sir.”
‘6 Are they correct likenesses ? ”
*255 “ They are perfectly correct as the bodies were at the time, except that the colors may not be exactly like they were at that time ; but otherwise they are as perfect as a machine will make them.”
The Court.—“It makes perfect likenesses?”
“ It is considered so, sir.”
Cross-examination.—“ Were the faces and heads of these dead men badly bruised ? ”
“They had that appearance, but I did not examine them close.”
“ Do you think they had the appearance of having been in water some time ? ”
“Yes, sir.”
“Was not the clothing on these persons wet ? ”
“Yes, sir.”
“Did not their faces have a bloated and distorted appearance ? ”
“I think they were bloated and discolored in places.”
“They did not look natural ? ”
“ They looked as natural as could be expected under the circumstances. ’ ’
“ I asked whether they looked natural ? ”
“I never saw them previous to that time, and I could not tell you.”
“Did they have the natural appearance of dead persons?”
“ They resembled dead persons very closely, I should judge.”
“Didn’t they show exposure of several days ? ”
“ I don’t think they showed they had been exposed for days.”
“ Would it not change the countenance of a dead person to lie in water three or four days ? ”
“ I suppose it would cause them to bloat, and any one thus bloated would look unnatural, but still would look like themselves.”
*256 “ You can tell who a man is who is bloated, for all that?”
“I think they were put upon some boards by the undertakers.”
The Court.—“ Was it the same day they were taken from the river ? ”
“Yes, sir.”
“ How long after they were taken from the vrater ? ” “ I took them about nine or ten o’clock; I think they were taken out some time near six o’ clock in the morning—I heard so; I did not know that.”
“ Where had they been lying from the time they were taken from the water till you commenced taking the photographs ? ”
“I was down, I think, about seven o’clock, and they were at the building at Mr. Traver’s; I did not get a chance to see them at all; I don’t know how much they had bloated ; I undertook to look in but couldn’t do it.”
“ Were they stiff? ”
“ I do not know how stiff they were; they raised them up.”
“Why didn’t you put them in a sitting position ? ”
“ I thought it was quite sufficient to take them.”
“Are the faces of these two persons lying at this angle as natural as they would be if they were sitting or standing?”
“ If they were alive and sitting in the proper position you would get a better likeness of them, sir.”
“You would get a better likeness if they were perpendicular?”
“The angle at which they were lying is not as favorable.”
“ It is not as favorable for you to take quite as natural a picture?”
“No, sir.”
The Court.—“ How were these taken ?-”'
*257 “ They were arranged on boards from the ground at first, and they proposed to set them up, and they tried it; but I noticed they slipped off, and they could not doit.”
“Do you think they sat at an angle of about forty-five degrees 2 ”
“ I don’t know, sir.”
“ Is that your impression 2 ”
“Yes, sir.”
“Was it a sun-shiny day 2 ”
“Yes, sir.”
“ How far was your camera from the bodies 2 ’
“ As near as I can judge, I should think it was within eight or nine feet.”
“ With a da guerrean camera can you take a photograph in the open air, with the light entirely around it, as well as in a room 2 ”
“I think not.”
“ In your room you usually have the sunlight peculiarly arranged by which the light is brought to bear upon a human face 2 ”
“Yes, sir; we arrange the light to produce lights and shadows.”
“ The more the light is concentrated upon the face, the better the photograph 2”
“I think not, sir.”
“ Don’t you usually have the person photographed sit back in the shade 2 ”
“This is not essential, since we can shade the lens ; we usually have a cloth thrown over the lens, this simply to give us a better light to look through the lens.”
“ If you were to take the photograph of two persons, and should take one in the room, and the other one in the open air, would you consider one as naturally taken as the other 2”
“ I should not consider it so, sir.”
*258 “You also say you would take a more natural picture if the figure was erect 2 ’ ’
“ Yes, sir; if the figure was erect.”
“ When the person lies at an angle, don’t you take the face at an angle 2 ”
“Yes, sir; naturally.”
The Court.—That is very obvious.
“ Why didn’t you turn these bodies upon their sides and take them in a natural position 2”
“ I didn’t think of it; if I had done so the features would have been more prominent.”
“Would you get a more correct picture in that way 2 ”
“ The features would have been more prominent.”
• “ Would they not have been more correctly taken 2 ”
“If the features were more prominent it would, make them more natural.”
“The expression would be more natural. While there was no expression to this at all 2 ”
“ The faces were swollen 2 ”
“ They had that appearance.”
“Were the faces discolored 2 ”
“Yes, sir.”
“ What was the color 2 ”
“Black and blue; there were bruises on their faces.”
“ Where there were no bruises was it discolored 2 ”
“T couldn’t say it was.”
“ Was it the natural color 2 ”
“It was the natural color under the circumstances.”
“Wasn’t the whole face, aside from the bruises, discolored by the action of the water, and light and heat 2”
“ Certainly it was ; they were dead.”
“Had they been personal friends would you have *259 been able to recognize them as readily as if they had not been lying in the water at the time ? ”
“If they had been personal friends, I think I should ; of course, they would not have looked as natural to me when I first laid my eye on them, but I think I should have known them.”
“The discoloration is not reproduced on the plate?”
“No sir ; we do not draw colors at all; we take light and shade, that is all we do.”
Direct examination resumed: “Theywere taken at the west side of the barn, they were at the north side of the livery stable, that is, the west side of the building? ”
“ Yes sir.”
Cross-examination: “Do you say these pictures are as natural, and could be as readily recognized as if standing, or sitting perfectly erect, or standing in this way?”
“Yes, sir ; to me, I think, in this posture and under these circumstances ; and I recognize them just as quick, I think.”
“ They would be just as natural ? ”
“Probably if I was acquainted with any of the circumstances, I should recognize them.”
The Court.—“Was it a correct likeness, for persons in the position they occupied?”
“Yes, sir.”
“If they were sitting up, they would be horizontal to the instrument ? ”
“Yes sir.”
“If at an angle, they would present the same appearance to the naked eye in that position ? ”
“ Certainly they would.”
Exceptions were duly taken to the rulings objected to. ■
The charge of the judge was as follows
*260 Gentlemen of the Jury:—We have now arrived at the close of this protracted investigation, and the fate of the prisoner is about to be committed to your hands. The testimony has all been taken. You have listened to it with patience and attention. The arguments of counsel have been heard. The court is about to submit to you a few remarks in regard to the law and the facts of the case, and then the solemn duty will remain to you to pass upon the life or death of the prisoner. He has been indicted for the murder of Frederick A. Merrick, on the seventeenth day of August last, in the store of the Halberts’, in the city of Binghamton, and it will belong to you to determine the fact as to whether he is guilty of that crime or not.
■ Under this indictment, he may be convicted of the crime of murder in the first degree, or of murder in the second degree, or of any of the various degrees of manslaughter ; and before I approach the brief consideration which I propose to devote to the evidence, it may be desirable to give to you the law on the subject of these various crimes, and to define them, so far as they may have any legitimate application to this case.
Murder in the first degree, so far as it is applicable to the facts and circumstances before you, is the killing of a human being, when it is not manslaughter, or justifiable or excusable homicide, with a premeditated design to effect the death of. the. person killed. This premeditated design must exist, and it must be completely formed before the killing takes place. Ho particular time is necessary to precede the act, except that the design must be complete and perfect, and fully formed in the breast of the prisoner. If thus formed, and the fatal blow, or the fatal shot, follows the execution of the perfected design, and that design be to take life, the offense is murder in the first degree, and the punishment is death.
*261 Murder in the second degree is thus defined in the statute: “Such killing, unless it be murder in the first degree, or manslaughter, or excusable, or justifi able homicide, as hereinafter provided, or when ”— I will call your attention to this part of the definition, —“ or when perpetrated without any design to effect death, by a person engaged in the commission of a felony, shall be murder' in the second degree.” If you find in this case the various ingredients of this crime, under this indictment, the prisoner may be convicted of this offense. It must be perpetrated by a person engaged in the commission of a felony ; and the prisoner was so engaged, if he was present at the scene of this transaction, having burglariously entered the premises, and undertaken to commit a larceny. But the offense must be perpetrated without any design to effect death. If perpetrated with that design, it is murder in the first degree. If perpetrated without any design to effect death—if this bullet was sped upon its fatal errand without any design to effect death, the prisoner may be convicted of murder in the second degree. “ The killing of a human being, without a design to effect death, in the heat of passion,”—or, in the first place, I will call your attention to another section: “The killing of a human being, without a design to effect death, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any crime or misdemeanor, not amounting to a felony, in cases where such killing would be murder at common law, shall be deemed manslaughter in the first degree.” “The killing of a human being, without a design to effect, death, in the heat of passion, and in a cruel, unusual and inhuman manner, unless it be committed under such circumstances as to constitute excusable or justifiable homicide, shall be deemed manslaughter in the second degree.”
*262 “ The killing of another in the heat of passion, without a design to effect death, by a dangerous weapon, in cases except such wherein the killing of another is hereinafter defined to be justifiable or excusable, shall be deemed manslaughter in the the third degree.”
I will call your attention to another section of the statute, because it seems to be one on which counsel for the defense rely: “Every person who shall unnecessarily kill another, either, first, while assisting an attempt by such other person to commit any felony, or to do any other unlawful act; or, second, after such attempt shall have failed, shall be deemed guilty of manslaughter in the second degree.”
The distinguishing characteristic, you will observe, between murder and manslaughter, at least between murder in the first degree, and of manslaughter in any of its various degrees, is the presence or absence of premeditated design to effect death.
Murder always requires the presence of malice— intent to kill—premeditated design. Manslaughter does not require this. It must be killing without an intent to effect death—in the heat of passion—in a cruel or unusual manner—or by means of a dangerous •weapon, to constitute it manslaughter in the second or third degree.
The application of manslaughter in the second degree, as claimed by the counsel for the prisoner, I will bring to your attention directly, when I come to speak of the facts of the case. The definition which I have given you, very properly preceded a brief consideration of the important facts which bear upon the present investigation. It is, of course, a most solemn and interesting one, for the life of the prisoner is at stake. ■Such an investigation can never be had without being of a solemn and responsible character. It has become so in the present case, on account of the circumstances which surround this transaction. The character of the *263 prisoner—his previous history—the stealthy entrance into this store—the noiseless step — the gathered plunder—the sudden appearance of the felons at the bedside of the clerks—their arousal from sleep—the grapple for life—the retreat of the two burglars— their quick return—the encounter with Mirrick—the shots fired by the third felon—his reappearance—his approach to Mirrick—the shot—the death—the flight— the retreat to the river—the unseen and probably instantaneous engulphing of two of the felons in the waters of the Chenango—the retreat of the third burglar—his non-appearance unless he is here in the person of the prisoner—the flight of Ruloff under the cover of the night—his arrest—his attempted escape— the bodies of the dead burglars presented before him— the scenes upon that occasion—the circumstances that were from time to time developed —the revelation of this man’s identity with Ruloff, through Judge Balcom —the public excitement—the crowds which attend upon this investigation, all tend to give this case a dramatic and thrilling interest seldom seen, and are likely to make it one of the most prominent trials in the annals of criminal jurisprudence.
I will call your attention briefly to the facts of this case, as they have presented themselves to my mind. Not with a view of influencing your action, not with a view of indicating my own opinion, but with the view of leading your minds to the consideration of some phases of the evidence which it may be desirable for you to consider as connected with the law of the case.
The corpus delicti, as it is called, the body of the offense, or fact of the killing, is clearly proved; that is, it seems to me to be so, and as one upon which you could scarcely doubt. That this store was broken open on the night in question ; that it was entered from the rear ; that there were three persons present upon that occasion, you will scarcely doubt. The important ques *264 tion is, was Ruloff one of them ? and to that, of course, as the great question in the case, most of the testimony has been directed. The only positive testimony upon that subject is that of Burrows, the surviving clerk, who testifies to the circumstances which took place upon that fatal night; and I need not recapitulate them here. They are fresh in your memory, and they have been commented upon by counsel. He had a special encounter with one of these felons, and the two having retreated, one returns and grapples with Mirrick ; the other, as he says, was about to ascend the stairs, and delivered two or three shots from a pistol at him, without hitting him. This third burglar finally encountered Mirrick, who was engaged in a conflict with the other burglar, and apparently having the advantage of him. This third felón approaches (according to the testimony of Burrows) these two persons thus engaged, and seizing the person of Mirrick, discharges a pistol into the back of his head. You will scarcely have any doubt that the discharge of this pistol shot was the cause of his death. It seems to me very idle to say that he might have had a heart disease, or he might have had a very delicate constitution, or a nervous organization ; nothing of that kind is in proof. We have here an apparent and sufficient cause for death. We must treat these subjects in a practical light. We must take facts as they come to us. There are no mathematical certainties in a court of justice. Mere possibilities, unproved possibilities, must be laid out of the case, and we must take the case as it comes to us in the light of the evidence. Is there any doubt that this pistol shot was the cause of this man’s death ?' Is there any real doubt that it was fired by the third burglar, who having discharged other shots at Burrows, and having been appealed to by the second burglar for help, came up and discharged this pistol into the head of Mirrick ? But whether it were the one or the other *265 (and upon this subject you are to exercise the same practical common sense and sound judgment which you bring to bear upon all the ordinary transactions of life, not being frightened at mere possibilities, but taking the evidence as it comes home to you), if these men were felons engaged in a common object, having a common felonious intent, designing to bring about the same result, having already committed burglary, prepared to perpetrate a larceny (and it is for you to say whether such men stop at murder to prevent exposure or detection), if these men had all these common purposes, the act of one is the act of all.
Each is responsible for the acts of the other, because they are co-conspirators—because they have a common purpose, and that purpose is one disowned by the law. But can there be a real doubt that this shot was fired by the third burglar, whoever he may be, whether he was the prisoner or not ? Burrows says he fired the shot, approaching him closely and delivering the contents of the pistol into the head of this unfortunate young man. Who was this man ? Was it the prisoner at the bar % Burrows thinks it was. He is the only living witness produced upon this occasion who survives to tell all of that transaction. Mirrick has gone to his last account. The prisoner, if he was present, has not been sworn, and Burrows is the only person who relates the incidents of that night. He says that the third burglar in his opinion was the prisoner. Of course, he was under some disadvantage in regard to observing critically and carefully the persons of these men. The scene was a most exciting one, and he would have been more than human if he had not participated in that excitement. The light was more or less dim, not affording the best opportunities. The felons, at one period of the transaction, at least, were masked, and, of course, their faces were not wholly open to observation, and yet much , might be done, or something *266 might be done in the way of general observation, and more or less of particular observation.
This clerk had an encounter with one of them, and the form and figures of the rest were seen by him. He could observe their general appearance, the contour of their persons, and if he heard a voice he would have been likely to remember it; and all of these circumstances, so far as they were open to observation, must have been impressed upon his mind indelibly. He thinks, under the solemnity of an oath, that the prisoner was the man. He had the best opportunities for observation and for knowing that fact, of any living man, except the prisoner himself, if he were there, and he gives you the results of his observations.
Of course, you must take this testimony as you take that of all others, viewing the man—regarding his position—his opportunities of observation—the great excitement under which he labored—the difficulties attending the transaction—and give to his testimony such weight upon this subject (as upon all others), as you think it deserves. Of course, it is more or less a matter of opinion.
Questions of personal identity are questions upon which parties are sometimes mistaken, and yet the testimony is admissible and competent, and even reliable. It may be contradicted, but we must take such testimony as we have. If you are satisfied with this testimony, with this identification, with this proof that the prisoner is the man, then you are not to dismiss it unceremoniously; and then the question is whether your investigations are not brought to a close—whether you are not prepared to render a verdict.
The prosecution, however, have very properly determined to supply additional evidence ; because, in a matter of this magnitude, affecting the life or death of the party accused, and affecting also the pure and certain administration of justice, it is highly proper that *267 corroborative evidence, if it exists, should be brought before you. Is there such evidence ? Now, these felons left certain articles of property behind them that we may assume to have belonged to them, for they did not belong to the proprietors of the store, nor to the clerks in it, and they must have been, I think we may infer, in the possession of one or the other of the felons. The first question is whether, among these articles, there is anything that tends to identify the prisoner. Of course, the question is not so important in regard to the two that are dead, if they were there upon that occasion, except as that testimony reflects light upon the fate of the prisoner at the bar. But it is proper to consider all of these articles of property left there at that time. Among these articles was a pair of shoes, said to belong, and sworn to belong, to one of the dead men, and to have been worn by him. This fact, if such man were living and on trial, would come home to you with great effect, as tending to establish his presence upon that occasion. There was a cap, said to belong to one of the persons. There were two pairs of shoes at the foot of the stairs, doubtless taken off to prevent noise when this transaction was going on. One pair of these shoes is claimed to belong to the prisoner at the bar. This seems to me a most important item of evidence ; for, if they did belong to the prisoner at the bar, what must be the inference you are to draw from that circumstance % Now, it is sufficiently established, you will probably conclude, that he wore, formerly, such a pair of shoes —in 1869, at Cortland, and in 1870, at New York, where he lived—that he was more or less in the habit of wearing such a pair of shoes; that they were somewhat peculiar in their form, either originally made so, or acquiring that peculiar form from the character of the feet. The indentations at the toe of one of the shoes, and the protuberance at another part of it, is claimed to fit exactly the foot of the prisoner, and to have been *268 [ tried on by him, and fitting him as the witnesses state. To whom do these shoes belong ? If they were the prisoner’s, what is the inference ? If they were not the prisoner’s whose were they? Is there any other, person to whom they are proved to belong ? If they were not the prisoner’s, where are the prisoner’s shoes? Are they in Hew York ? They are not. What has become of them? If these belong to the prisoner, the question is answered ; they are here produced before you. Since August 15, these shoes have not been seen in the city of Hew York. Since August 16 or 17, at least, the prisoner has been here. Where are the ¡prisoner’s shoes, if not here? That is a question for I you to answer. That is a very important element in | the investigation of this case. Was Ruloff''here on I August 16 ? Spaulding claims to have seen him on the railroad bridge, with halting gait, wearing these shoes, or shoes like them, with an umbrella and a bag or satchel in his hand, like the umbrella and satchel which were discovered upon him at a subsequent night. Did Spaulding see him upon that occasion ? If he did, Ruloff was in this neighborhood. What was he doing here ? Ho explanation is given. Mr. Stone claims to have seen him at the Lewis House. J. B. Lewis thinks he saw him at his store about ten o’clock at night, with this peculiar hat on, with slits in it, designed, doubtless, to adapt itself to a larger or a smaller head as occasion might require; that he called for liquor, and was furnished it, and went away ; and although having some doubt on the question, he is inclined now to think that that was Ruloff, rather than anybody else. Of course, a largo amount of testimony upon such a subj ect is not probably to be obtained. These men, if they came here to do this burglary, probably did not make themselves very public. They had a felonious intent. How they obtained the knowledge, if they did so, that this store was more readily accessible; whether they had *269 any accomplices in this neighborhood or not, it is not, perhaps, important to inquire; but it is obvious they had a motive for concealing themselves in this neighborhood on August 16. On August 15, two of these men were occupants of the house 170 Third-avenue. Shortly after that, both were found here, one a drowned robber, the other the arrested Ruloff. They have not returned to the city of Hew York, either of them, having disappeared about the fifteenth. Where did they go ? Did they come here ? I shall presently call your attention to the fact that Jarvis was here, and was one of the drowned men, as a matter of reasonable inference. These are, however, all matters for your determination, not mine. And Dexter was here, who also disappeared from the city of Hew York some time in the early part of August. Was Ruloff here? On the night following, or the early morning following the night of this burglary and murder, Ruloff is shown to have been here. He was arrested. He was stealing away under cover of the night.
He was apparently avoiding public observation. He was retreating by the railroad, not in a railroad car, not in company with others, but secretly, in the dead of night. The third felon has been seen by a lady in the neighborhood, or she saw a third person after the two retreated to the river and were engulphed in its waters. The third felon was seen winding his way stealthily along a wall on the flats, in the rear of this building. You can scarcely doubt that there were three men; and on the very night following this burglary, Ruloff was arrested. About twelve o’clock at night, he was commanded to stop—refusing to do so—endeavoring to escape—retreating to an outhouse—avoiding observation—detected —arrested—taken to this place and examined—refusing to disclose his name, or giving a false one—sometimes George Williams, sometimes Leurio, sometimes Howard, some *270 times Dalton, sometimes Charles Augustus, now, Edward H. Ruloff. He refused to give an account of himself. Why, in the dead of night, was he traveling away from this place % What was this man of scholastic pursuits and domestic and retired habits, doing here upon that occasion ? He refuses to own the shoes. To several of the witnesses he says he never wore shoes. He cuts up his hat and throws it into the sewer of the jail; he tears up his shirt and disposes of a part of that in the same manner.
He disavows wearing shoes ; ignores any knowledge of the other felons ; said he had no acquaintance with them ; gives no satisfactory account of them or of himself, or of his friends, or of his presence here, or of his travels. All of these things are proper subjects for consideration by you. It is true the prisoner is not bound to be sworn. It is true, the prosecution is bound to make out their own case, and must satisfy you by evidence on their own part; but all of these things -you have a right to consider, and draw your own inference from them. If he was here on the night of the seventeenth, or the early morning of the eighteenth, within twenty-four hours after this murder was committed, where was he on the night of the sixteenth ? Had he come into Binghamton during the day % If so, what, motive for concealment % Where was he during the twenty-four hours preceding that time ? If he was here on the night of the seventeenth, is there not some reason to infer that he was here on the night of the sixteenth ? He left Hew York on August 15; that is, he left the premises where he had lived, and has never been seen there since. Letters arrived there for his companion. One addressed by the sister of Jarvis to her brother, post marked Rensselaer county, on August 15, and arriving at that place within a day or two afterwards, dated on the fourteenth. What were these men doing here at that time % I say these men,— *271 the question is, whether two of them are not clearly proved to have been implicated in this burglary, and is there any doubt that Jarvis was one of them, identified by several witnesses—through the photographs, and wearing a coat which is recognized—having upon his person (I think it was he), some bits, the like to which were found in New York, and fitted the brace which opened the door by which this store was entered. I need not recall to you all of the evidence which tends to fix upon this man, his presence upon that occasion, because you scarcely doubt, I think, that Jarvis sometimes went under the name of Thompson, and sometimes went under the name of Curtis, and was one of the persons who entered that store. Perhaps there is as little doubt that Davenport was another, whose real name was Dexter. He is recognized by his brother— recognized by Mrs. Brady—recognized by the coat he had on—recognized by the keys in his pocket, and recognized by the book which the little boy brought him when he was in Cortland jail. These two men, you will probably assume or infer, were two of the burglars present upon that occasion. Who was the third? That is the important question for you to solve from this evidence. He is partially identified by Burrows—wearing shoes much like those found on the premises—his own shoes, if they were not the same, not produced here to contradict them. Disappearing from New York about the same time as the others— proved to be here—proved to have had in his possession, and in this secretary in New York (or at least proved to have been found there), burglar’s tools. It is for you to say whether they arrived there after his departure. He is proved to have had in his desk, pieces of newspapers which match the residue of the paper found in a satchel in a swamp in this neighborhood, containing, at the same time, articles of wearing apparel, belonging to another of these men. He is *272 proved to have had in his possession, keys which open both of the doors at Ho. 170 Third-avenue ; one of which was ordinarily kept by Jarvis, and the other by him—as found on the night of the seventeenth, both in his possession—both sets in his possession, one in his pocket, the other in the satchel. These are the principal circumstances. There are doubtless others—the short-hand writing, and other facts to which I do not deem it necessary to advert, and which are relied upon by the prosecution to connect this man with this crime, and to prove him present on this occasion.
I will recur, in this connection, to the ground taken in reference to the prisoner, assuming that he was present, which is claimed to exculpate him. For it is said that he was at most, guilty of manslaughter in the second degree, and he is protected under this provision of law: “Every person who shall unnecessarily kill another while resisting an attempt by such other person to commit any felony, shall be deemed guilty of manslaughter in the second degree.”
How if we understand the argument of the counsel and of the prisoner himself, it is claimed that Mirrick and Burrows were attempting to commit a felony—that is, to kill one of these burglars—and that this man killed Mirrick ; the prisoner, or the party, whoever he was, killed Mirrick, to prevent the execution of such a crime. Well, gentlemen, we must look at the circumstances of this transaction as they are. Here were two clerks, manly and faithful sentinels over the property of their principals, endeavoring to protect the store from robbery, and its contents from plunder, suddenly confronted in the dead of night, by these burglars, three to two. Are we to weigh with scrupulous care the violénce which these clerks are to employ lest they, should be charged with unnecessarily killing a burglar? Must they wait to have the store plundered and themselves killed, before they do any *273 tMng in their own defense? It is for you to say whether burglars, who break into a store and rob it of its contents, and are exposed in the act; detected, and likely to be arrested, will not commit murder to prevent exposure and conviction. What inference should these clerks draw, except that these men who engage in a felonious act had a felonious purpose, and were probably willing to do further crimes to consummate their intent ? Were they, I say, to wait for further demonstrations on the part of these men, before they resisted or attempted to overcome them ? Will you then require that they should be‘particularly careful not to kill the attempted felon? Of course, there was no necessity to kill. Do you believe these men, these burglars, had relinquished their design ; and was this man coming back with the peaceful purpose of preventing injury to his comrade, relinquisMng all attempts to plunder the store, and all fear of exposure; was he coming back simply to rescue Ms comrade’s life from the attack of Mirrick? Xo; but, gentlemen, a person who unnecessarily kills another, while resisting an attempt by such other person to commit a felony, is himself guilty of manslaughter in the second degree. But before you shall hold these clerks responsible for crime on that night, or convict them of a felonious purpose, you should be careful to investigate the facts, and bring your mind satisfactorily to such a conclusion. Burglars who break into a store are not entitled to have the most innocent construction put upon their purposes. Burglars who appear at the bedside of sleeping clerks are not entitled to the most careful handling of their persons lest some injury be done to them. It was proper for the clerks to protect their own lives. It was proper for them to protect the property of their principals ; and it is for you to say whether it was not proper for them to judge from appearances *274 as to the ulterior purposes of these men, found under such circumstances in this store at night.
How, gentlemen, I have alluded, I think, to the main circumstances of this transaction, and the case is now to be committed to you. It is a case, independent of the testimony of Burrows, mainly depending upon circumstantial evidence ; that is, upon facts 'and circumstances proved by different witnesses, tending to show items of evidence which bear more or less upon the probabilities of the case. The body of the crime having been proved, it is entirely proper, if the proof be satisfactory to you, to prove the residue by circumstantial evidence. Circumstantial evidence is admissible in all courts of justice. Sometimes it is of the most satisfactory character, for in a multiplicity of incidents, and the various items of evidence thus brought together from every quarter, and often converging to a single point, you find a body of facts which bear with irresistible force upon the matter in hand. And thus circumstantial evidence, when the circumstances are numerous, and when they tend directly to a single point, often furnish a body of evidence of the most satisfactory character. Of course, they must have these characteristics, in order to have weight, or to determine your minds conclusively in a particular direction. But if they are of that character —if they go to support and corroborate the positive evidence in the 1 case, they are often of that nature which will lead your minds inevitably to a particular conclusion. With these facts and circumstances thus developed in evidence to lead your minds to a particular result, they furnish but another illustration of the great truth, that “truth is mighty and will ultimately prevail.” She may be for a time defeated and overcome—she may be obscured by the clouds of ignorance, of sophistry and of falsehood, but she will ultimately assert her supremacy, and shine forth in the *275 undiminished brightness of her nature ; coming from God as her source—returning to him as her ultimate aim, she meanwhile walks majestic and serene in all the pathways of human action ; bringing light out of darkness, and order out of confusion, and sooner or later asserts her irresistible power in all the transactions of men.
The case, gentlemen, demands your most patient and solemn consideration. You are to regard it as unproved until it is established to you satisfaction. This prisoner is to have'the same benefit that other alleged criminals have, upon the question of doubts. This crime must be proved, before you convict, beyond a reasonable doubt. Your minds must be brought to a solemn conviction of the guilt of the prisoner before you find a verdict against him. You must be convinced beyond a reasonable doubt—beyond a reasonable doubt. Not necessarily beyond the possibility of a capricious or imaginary doubt, but you must look at this subject as reasonable men, and bring to it the best faculties of your nature and the highest intelligence you have—the utmost conscientiousness—the most careful deliberation, and then you must declare the result. Mathematical certainty is unattainable in a court of justice—a possibility of mistake always exists: but we are to treat this subject, as all others in courts of justice, in a practical way—as sensible men. A body of evidence must appear which brings your minds to a certain and satisfactory conclusion. If in this investigation that conclusion is favorable to the prisoner, it will be your appropriate and pleasing duty to discharge him from imprisonment, and leave him to the admonitions of his own conscience, and to the impressive lessons of this hour. If, after the same patient attention to, and solemn consideration of the testimony, you shall be obliged to bring your minds to a different result, and declare his guilt, I have no doubt you will *276 do it with the same solemnity—the same fearlessness— the same impartiality, which should characterize in all eases the notions of men placed under the solemn responsibility under which you act.
In this confidence, gentlemen, I commit this case to you for its final disposition.
Becker, for the prisoner, thereupon duly excepted to so much and such parts of the said charge and instructions given to the jury as submits to them to find as a fact, whether or not the prisoner was guilty of murder or of manslaughter in any degree as charged in this indictment.
Seymour, of counsellor the prosecution, requested the court to charge the jury :
1. That to constitute murder in the first degree there is no specific time required to intervene between the completion of the design to take life and the carrying of such design into effect.
The Couet.—I so charge.
[Prisoner’s counsel duly excepted.]
2. That if the design to take life was complete, even for an instant, in the mind of the actor, before it was carried into effect, it is all that the law requires in that respect to make out the crime of the murder in the first degree.
The Couet.—I think it is. Gentlemen, you must be satisfied that the design was perfect and complete, and fully possessed the mind of the prisoner before the act was done. If it was so complete, and the shot was fired in execution of the consummated purpose, and the killing resulted from that, it is murder in the first degree.
[Prisoner’s counsel duly excepted.]
Prisoner’s counsel also duly excepted to that portion of. the charge and instructions to the jury wherein the court said, in substance, as follows:—•
*277 “Mirrick has gone to kis last account. The prisoner, if he was present, has not been sworn, and Burrows is the only person who relates the incidents of that night.....It is true the prisoner is.not bound to be sworn. It is true the prosecution are bound to make out their own case, and must satisfy you by evidence on their own part, but all of these things you have a right to consider and draw your own inferences from them.
The Court.—I supposed those were remarks in your favor; but you have the right to except to them.
To the Jury.—I should state to you, gentlemen, that there is no law requiring the prisoner to be sworn, and there is no inference to be drawn against him from the fact of his not being sworn.
Beals, of counsel for the prisoner, requested the court to charge the jury as follows :—
1. That if the person who fired the shot fired it not to take life, or with malice, or a premeditated design to take life, but simply to rescue his companion—and the jury may infer this from the shots fired over the heads of Mirrick and his adversary, and lodged in the wall—if they infer it was fired by the one who shot Mirrick, then the jury should not find a verdict of murder in the first degree.
The Court.—That is substantially the law. You must find a premeditated design to effect death. You must find something more than a mere attempt to rescue, before you can convict of murder in the first degree. I have given you the rules which should govern your action upon that subject, and I have no occasion to change.
Prisoner’s counsel continued the requests to change, which, with the responses of the judge, were as follows :—
2. If, from the fact that the burglar who was prostrate and stricken by Mirrick and Burrows, and called for help, and the person who fired the fatal shot re *278 turned to render such help; and all that he did subsequently was intended to render such help, and to rescue his endangered companion; if from all this, the jury believe the object of the one who fired the fatal shot was not simply to kill, then the verdict should not be murder in the first degree.
The Court.—I charge substantially that, as I understand it. You must pay attention to these “requests,” and see that the facts are not misstated. If the object was simply to rescue his companion, if he was there with no felonious object, with no intent to kill, no intent to do bodily harm, beyond rescuing his comrade from the embrace of Mirrick; if under the evidence in this case, you can reach such a conclusion, the prisoner is not to be found guilty of-murder in the first degree.
3. If the first flight of the burglars and the missiles thrown at them by Mirrick, the call for help, and the endangered condition of the prostrate burglar, the return of Ms companion in response to his call, the interception of them by Mirrick and Burrows, the firing of the shots on the stairs, the clinching of one of them by Mirrick, and their struggle, and- the apparent advantage of Mirrick over his adversary, and the desire to avoid detection and arrest of any of the burglars, or their death at the hands of Mirrick—if all these aroused and heated the blood of the one who fired the fatal shot, then, under the statute, the prisoner cannot be convicted of murder in the first degree.
The Court.—If these are the circumstances attending the commission of this crime, in the' manner indicated in the request to charge, and if, from all that transpired, you feel at liberty, consistently with your consciences, to draw such a conclusion, the prisoner is not to be found guilty of murder in the first degree.
4. That the jury must be satisfied, by the evidence in this case, that the prisoner’s hand fired the fatal shot wMch produced the death of Mirrick.
*279 The Coubt:—They must be satisfied that the prisoner’s hand fired the fatal shot which produced the death of Mirrick, or that he was acting under the influence of a purpose common to all, for the promotion of a bad cause; that the others were co-conspirators with him, and that they had the same object in view, and that the same purpose actuated the breasts of all, before they can find him guilty of murder.
5. That the jury must be satisfied by the evidence in this case, that, if such death was produced by a shot fired by another hand, that there was such an actual and overt concert and complicity to effect that precise object.
The Court.—Substantially, that is so.
6. The jury must be satisfied by the evidence, that the death of Mirrick resulted directly from the shot by and from the bullet found in his head on the post-mortem examination.
The Coubt.—That is true.
7. The jury must be satisfied from the evidence, that the death of Mirrick resulted from no other cause than the shot fired into his head.
The Coubt.—I think so.
8. The jury must be satisfied, beyond a reasonable doubt, that the death of Mirrick resulted from a shot fired from the hand of the prisoner.
The Coubt.—Yes, I think so ; if fired in the way proved.
9. The jury must be satisfied, beyond a reasonable doubt, that the death of Mirrick resulted from the bullet found in bis head, and from no other cause.
The Coubt.—I think so.
10. If there is any reasonable doubt in the mind of the jury as to the cause of the death by the prisoner, or as to the hand which produced it, they should give the prisoner the benefit of that doubt by a verdict of acquittal.
The Court.—I have already told you, gentlemen, and I repeat the charge, that if three persons were co- *280 . conspirators and felons, acting for a common object— a common purpose—willing to perpetrate murder to effect their object, then, in my opinion, the act of one is the act of all; but of course you must be satisfied of the facts, whatever they are, in all of the elements which make up the crime beyond a reasonable doubt.
11. If the jury are satisfied, from all the testimony, and from all the circumstances, that Burrows was excited on the morning of the fatal occurrence, or that he had made contradictory statements relative to the matter, and that his testimony thereby has been impaired, they should give to the prisoner the benefit of any doubt resulting from such excitement and contradiction.
The Court.—Of course, gentlemen, you must be satisfied, before you give the fullest confidence to any human testimony, that it was honest and that it was correct. And if there are circumstances which impair either the honesty or credibility, or accuracy of the testimony, you must make a proper deduction, and give the prisoner the benefit of any doubt arising from such circumstances.
[Prisoner’s counsel duly excepted.]
12. That there is no evidence whatever to show that the prisoner knew of any burglar’s tools in his room in New York, down to the time that the prisoner quitted that room for the last time ; but from the testimony of young Jakobs, and his sister Pauline, the contrary inference must be drawn, and that nothing suspicious was in the possession of the prisoner, or in his room.
The Court.—I charge the first part of that request, and decline to.charge the last part of it. I am aware that there is no express testimony, that up to the time the prisoner left New York he knew that there were any burglar’s tools in his room. I charge that from, the evidence in the case; but I do not feel at liberty to *281 charge that the contrary inference must be drawn. You must act according to your belief; you are the judges of fact. These tools were found in that room ; when they were placed there is a matter of fact for you to determine. There is no proof that I know of that they were there before the prisoner left; that is, nobody swears to it, but I will not charge you that you are not at liberty to infer that they were there. There is no proof in regard to it.
[To which the counsel for the prisoner duly excepted.]
13. And that they must infer that from the evidence submitted to them in this case.
The Court.—They must infer that from the ' evidence and circumstances developed by the testimony of the witnesses. Whether these burglar’s tools were there or not is to be determined by you upon a consideration of all the evidence. I give you no information as to the inferences you ought to draw one way or the other. If they were put there after the prisoner left, of course they have no bearing whatever upon the guilt of the prisoner.
[Prisoner’s counsel duly excepted.]
14. That if the prisoner and his companions, on the occasion of the homicide, entered upon the premises of Halbert with the common purpose of larceny, in stealing the property of said Halbert, and that the violence of the prisoner’s companion was merely the result of the situation in which he found himself, and that he proceeded from the impulse of the moment, without any concert, then the prisoner will be entitled to an acquittal.
The Court.—I decline to charge in that way.
[Prisoner’s counsel duly excepted].
15. That to make the prisoner a principal, the jury must be satisfied that when he and his companions went out with a common illegal purpose of larceny, *282 they also entertained the common guilty purpose of resisting to death or with extreme violence any person who might end'eavor to apprehend them.
The Court.—I decline to charge in that way.
[Prisoner’s counsel duly excepted.]
Becker, of counsel for the prisoner, requested the court to charge the jury as follows:
1. That in no view of the cáse can the prisoner be convicted of more than manslaughter in the second degree under the statute ; and that upon all the facts in the case, the killing of Mirrick was not murder or manslaughter, as charged in the indictment; but was, at most, only a special form of manslaughter in the second degree.
The Court.—I decline so to charge, and will leave the disposition of the facts in the case to the jury, according to the law, as I have laid it down.
[Prisoner’s counsel duly excepted.]
2. That the killing of Mirrick was not done in prosecution of a felonious intent, but was done in suppressing unlawful violence, and in resisting a felonious attempt unnecessarily to kill, and to do great bodily harm. .
The Court.—I decline to charge that as a matter off law, and will leave that to bé determined by the jury, upon the evidence.'
[Prisoner’s counsel duly exceptéd.]
3. That the right to take life in the first instance, and at once to kill an offender, is confined to cases of “known felony,” committed with force or by surprise, in which there is an urgent necessity, admitting of nO delay, or a felonious attempt in imminent danger Of being accomplished.
The Court.—My impression is, that the request is substantially correct; but I would not say, absolutely, that there are no cases in which the right to take life exists, because I do not feel called upon to ex *283 ercise my ingenuity or recollection in the determination of a case in which that right exists. I have given the law as applicable to the facts of this case, as I understand it.
[Prisoner’s counsel duly excepted.]
4. That when two of the burglars had withdrawn, and the third was powerless, the mere presence of that third upon the premises, neither offering violence, nor in a condition to do so, was not such “ known felony,” as to justify holding him down, and inflicting upon him the violence proved to have been inflicted in this case, by two men who had him completely in their power.
The ■Court.—I will leave these facts, gentlemen, to you. You must find the facts. If they exist, as contained in that request, there was no special necessity for any extraordinary violence upon this first burglar. I don’t exactly see the bearing, however, which it has upon the guilt of the prisoner in this case. That man is not here for trial, and precisely what we should do in his case, I am not able to state.
[Prisoner’s counsel duly excepted.]
5. That whether the prisoner can be convicted of manslaughter in the second degree, depends in the first instance, upon proof whether the killing of Mirrick was done in prosecution of a felonious intent, or whether it was done in performance of an act which was lawful and right.
The Court.—I think that is true.
6. That if the fatal shot was fired upon a sudden impulse, in the heat of excitement or anger, it does not amount to murder in the first degree.
The Court.—It does not. It must be fired with a premeditated design to effect the death of the person killed, in order to constitute murder in the first degree.
7. When two of the men had withdrawn, and the *284 third was powerless, extreme violence was no longer necessary, a reasonable opportunity was given for milder measures, and Mirrick should have acted accordingly.
The Court.—If those are the facts, then the conclusion is right; but whether the facts are so or not, I leave you to determine. You must not assume the facts to be so because they are contained in the request. I don’t think that felons who break into a store and plunder it, are generally entitled to the most merciful construction of their motives.
[Prisoner’s counsel duly excepted.]
8. The return of the two men who had previously withdrawn, is not proved to have been made in furtherance of the original design to steal, or to have had any other object than simply to suppress the unlawful violence of Mirrick and of Burrows, and to rescue their companion from imminent peril of his life.
The Court.—I decline to charge that as a matter of law. I leave that for the jury to determine upon the evidence before them.
[Prisoner’s counsel duly excepted.]
9. That in itself, their, return for this purpose was lawful and right. It was, in fact, an act of duty to. assist and rescue their comrade, and it became criminal only by the excess of violence employed on their part in suppressing the violence of Mirrick and of Burrows.
The Court.—I hardly know what to say upon that subject. A mere attempt to rescue a person from death, is generally lawful and right, and I don’t know but it would be in this case. I am inclined to think it would, if the return was simply for that purpose, and with no felonious intent, and with no design to do anything except to take their comrade out of their way.
10. Whatever the excess of this violence, it was, at least, employed in resisting other violence, in preserva *285 tion of the peace, and in the prevention of a felonious attempt unnecessarily to kill an intercepted felon, or to do him great bodily harm.
The Court.—I don’t know whether it was or not. I leave the jury to determine that one way or the other as they shall think proper. I do not think I am called upon to do it myself, as a matter of law, upon the facts of the case.
[Prisoner’s counsel duly excepted.]
11. That even if fully and satisfactorily identified as belonging to the prisoner, it does not necessarily follow that these shoes were still in use, or that they were worn by the prisoner on the night in question.
The Court.—I don’t know as it does, gentlemen, but I will leave that for you to determine. It wordd strike me that there was a very strong probability of it; but there is evidence from which you must determine for yourselves.
[Prisoner’s counsel duly excepted.]
12. That the probability of guilt arising from this circumstance, is so far qualified by reasonable possibilities of innocence, as to afford no sufficient ground for any definite presumption against the prisoner
The Court.—I decline to charge that.
[Prisoner’s counsel duly excepted.]
13. That the killing of Mirrick, as shown by the evidence, was not murder or manslaughter in any degree, as charged in this indictment, but was, at most, only a special form of manslaughter in the second degree.
The Court declined so to charge and instruct the jmy-
[The counsel for the prisoner duly excepted.]
Last.—That if the killing of Mirrick was necessary, in order to prevent him from unnecessarily killing another, it was not murder in the first degree.
The Court declined so to charge and instruct the jury.
*286 To which decision counsel for the prisoner then and there duly excepted.
The Jury rendered a verdict, “ guilty of murder in the first degree.”
February, 1871. Supreme Court. The cause was removed by writ of error, to the supreme court, in the third department, third district, at general term, where after argument the conviction was affirmed, the following opinions being rendered. *
Potter, J. [After stating the facts.]
That the homicide in question was committed by the prisoner, or by one of the three burglars present on the occasion, is clear from a mass of circumstantial and positive evidence, of such weight and strength as to carry absolute conviction to the mind that the jury have fairly discharged their duty upon the consideration of the facts. Our review will, therefore, be of the proceedings upon the' trial; and to the purpose of seeing whether this conviction has been had according to the forms of law.
1. The first objection is to the array of a juryman, one John W. Travis, who was impanneled and sat in the cause.
This objection arose as follows :
[The opinion here recited the proceedings as to impanneling the juror, mentioned on page 250.]
The objection, it is seen, is only to the manner of the summoning of this juror. The prisoner’s counsel has left this objection upon the mere statement of it, without pointing out to us the provision of law which makes this order of the court erroneous.
We are, therefore, left to search for ourselves for the provisions of the statutes which regulate the im *287 panneling of jurors. By section 5, of chapter 2, title 5, part 4, of 2 Rev. Stat., p. 734, it is provided that the jury for the trial of an indictment shall be drawn in the same manner as is prescribed by law for the trial of issues of fact in civil cases. By section 120 [54], 2 Rev. Stat., 420, ch. 7, title 4, part 3, it is provided that whenever a sufficient number of jurors, duly drawn and summoned, do not appear, or cannot be obtained to form a jury, the court may order’ the sheriff to summon from the bystanders, or from the county at large, so many persons qualified to serve as jurors as shall be sufficient.
In 1861, the legislature, by an act (ch. 210), provided, that in cases of an insufficient number of jurors attending any court, the supply should be obtained by ordering the sheriff to draw names from a box to be provided by the clerk, of jurors residing in the town where the courts are appointed by law to be held.
This act was found most impracticable, and was repealed in 1867 (ch. 494), so far as to restore the provision of the Revised Statutes last above cited, and since that time they seem to remain unchanged, unless by the act (ch. 409), of the Laws of 1870.
The act of 1870 provides that when any court of oyer and terminer shall find that the public interest requires' the attendance at such court of a greater number of petit jurors than is now required to be drawn and summoned for such court, then such court may, by an order entered in its minutes, require the clerk of the county to draw, and the sheriff to summon, such additional number of petit jurors as it shall deem necessary, which number shall be specified in the order, not exceeding thirty-six.
The section then proceeds to prescribe the clerk’s and sheriff’s duty under the order, but no juror so summoned shall be required to appear in less than two days from the date of the order.
*288 The same section declares that all provisions of law, relating to the swearing in and summoning of jurors, &c\, . . . not inconsistent with this act, shall apply to the jurors summoned under this act.
This act does not in terms repeal the existing statute, or any other act in relation to the summoning of jurors, nor the power of the court to direct the sheriff to summon from the bystanders or from the county at large so many persons as shall be sufficient to form a jury ; nor is this latter act so repugnant to this revision of the Revised Statutes as to repeal it by necessary implication.
All the systems now authorized by law, may be found convenient in practice under different conditions, circumstances and necessities of the case presented. For an example: There is one provision in the statute applicable in advance of the time of holding the court, to the effect that “whenever, in the opinion of any justice of the supreme court, more than thirty-six jurors shall be required to attend any court of oyer and terminer, he may by order under his hand direct such additional number of jurors, as he shall deem necessary, not exceeding twenty-four, to be drawn (2 Rev. Stat., 417, § 107 [41]).
This is an important provision, inasmuch as the presence of a large panel at the opening, and during the continuance of the court, saves the delay ■ of business by new orders for talesmen, and the waiting for their summoning and attendance after the organization of the court.
It cannot be claimed, I think, that this provision is repealed by the act of 1870, for even with this provision carried out, it was sometimes found in practice that this extra panel previously ordered by a judge, would be exhausted in capital cases ; and the resort be had to an order for talesman under the provisions of *289 2 Rev. Stat., 420, § [54] of summoning bystanders and at large.
So too, it is equally convenient, if not necessary, to have the provisions of the act of 1870, as an additional, or cumulative provision to the existing acts. For example, as in the case before us, a single juror only was wanted.
The power to summon from the bystanders for this purpose, without depriving him of his rights of challenge for cause, or peremptorily, was of great practical advantage to the facilities of business ; otherwise two days must intervene, before the trial could proceed, for the want of a single juror. But in looking at the terms of the act of 1870, it neither bears upon its face the evidence of an intent to repeal the existing statutes, nor is it mandatory in terms as to its provisions, and cannot, therefore be regarded as the only and exclusive method of obtaining additional jurors to attend at such courts.
It may be resorted to, ‘1 when the court shall find that the public interests require, &c.” It seems that, the court did not find, that for a single juror, the public interests required a delay of two days.
I have come to the conclusion that upon the ordinary rule of the construction of statutes, the court committed no error in ordering jurors from the bystanders, to supply the needed man.
The juror selected was without any other objection.
2. The objection to the form of the indictment is without force.
It was good in form, for the crime of murder in either degree, and under it, if the facts should warrant, a verdict could be sustained for manslaughter in some of the degrees. This is too clear to require discussion, or the citation of authority.
3. All the argument of the prisoner’s counsel, based upon the testimony that was detailed on the trial, and as to particular portions of its influence, its weight, and the probabilities of its being true, cannot *290 be considered here upon writ of error, except in relation to those portions of it as to the effect of which the judge was requested to charge, or refused to charge.
4. We proceed to examine some of the exceptions taken by the prisoner and his counsel to the ruling of the judge on the trial.
The first of these objections was taken by the prisoner himself, when testimony was being given as to the identity of the two persons drowned with those of two of the burglars of the store.
[Here was quoted the prisoner’s objections to testimony which are stated on pp. 250 and 351.]
It was proper for the judge to rule then, as he did, rule ; but if there could be a doubt existing then, as to the prisoner’s identity, it was abundantly supplied afterwards ; and, at the end of the case, a motion was made, in effect, to strike out all evidence in furtherance of a common design, between the two burglars, -Jarvis and Davenport (Dexter), and the prisoner; which motion was denied.
We can now only say, that the reading of the testimony is not only sufficient to confirm and sustain, but to demand our approval of these rulings by the judge.
The next exception is, to the ruling of the judge to the offer of identification of the two burglars who were drowned in attempting to cross the river, by photographs taken of them after death, and by witnesses who had known them in life.
The objections were put in the following form :
[Here were recited the objections to the testimony as to identity, stated on pp. 251, 252, and 254 to 259.]
Ho authority was cited to show this to be error, or upon the other side, to sustain the rulings ; nor, in my opinion, does it require any. It is the' every day practice to use the discoveries in science to aid in the investigation of truth.
As well might we deny the use of the compass to th,e *291 surveyor or mariner ; the mirror to the truthful reflection of images; or spectacles to aid the failing sight, as to ■deny, in this day of advanced science, the correctness, in greater or less degree depending upon the perfection of the machine and the skillful admission of light, to the photographic instrument, in its power to produce likenesses ; and upon the principle, also, that a sworn copy can be proved when the original is lost or cannot be produced, this evidence was admissible.
There is no other question arising during the taking of evidence in the case, as to the admission or rejection of evidence, that possesses any point worthy of consideration. The corpus delicti was fully proved.
The learned judge charged very fully, clearly and'correctly, the law of homicide. The only remaining questions in the case, are such as arise upon supposed error in the charge of the judge to the jury, or in his refusals to charge as requested by the prisoner’ s counsel. The chief remaining ground which the prisoner claims to be error, is two portions of the charge blended together, and one exception taken to both, thus united, and not an exception to each portion severally.
These two blended portions of the charge are in the case presented thus : “Prisoner’s counsel also duly excepted to that portion of the charge and instructions to the jury, wherein the court said in substance, as follows : “ Mirrick is gone to his last account. The prisoner, if present, has not been sworn, and Burrows is the only person who relates the incidents of that night.”
“It is true the prisoner is not bound to be sworn. It is true the prosecution are bound to make out their own case and must satisfy you by evidence on their part, but all these things you have a right to consider, and draw your own inferences from them.”
The Court. ‘ ‘ I supposed those remarks were in your *292 favor, but you have a right to except to them.” Then the court said to the jury, “ I should state to you, gentlemen, that there is no law requiring the prisoner to be sworn, and there is no inference to be drawn against him, from the fact of his not being sworn.”
It is not a fair presentation of the charge, to separate a sentence in one part of a charge from its connection with other explanatory matters therein, as if standing alone, and it is equally unjust to blend different sentences of a charge, each separated from its train of connections and circumstances, and put them together, as if connected, and then except, to them as if they were one connected utterance.
Technically, when this is done, if a part of the utterance is without objection, the exception fails,.even if it be good as to one part, if it includes both as one.
But omitting technicalities in a case of life and death, it is but just to the learned judge who made this charge, that the separate parts of this blended matter excepted to, should be viewed in their several surroundings.
[Here was quoted nearly all the language of the charge contained on p. 265.
Reading the excepted portion of this whole statement above, it is seen that it does not give the idea intended to be communicated.
The judge was evidently intending to impress the jury with what was the uncertainty of this portion of the evidence as to the prisoner’s identity of the number of persons, three being dead.
Burrows is the only living witness, except the third burglar. If that third burglar was the prisoner, he had not been sworn, so that there was but one witness to the prisoner’s identity, and he under a state of excitement, with a dim light, and seeing but a part of the person without his mask.
*293 This part of the charge, standing by itself, might well be construed as favorable, rather than unfavorable to the prisoner.
It was clearly showing the uncertainty of this evidence of identity of the prisoner, and can hardly be forced into another construction, and in reference to it the judge remarked, “I supposed these remarks were in your favor.”
In another, a quite remote and different portion of .the charge, the learned judge was giving a statement of the things, or circumstances, other than the testimony of Burrows, which fixed the prisoner’s identity, as being one of the three burglars* to wit:
[Here followed a quotation of the reference to Ruloff from the middle of p. 269 to the middle of p. 270.]
Whether the learned judge, after the enumeration of such a variety of things which he told them they might «consider, began another enumeration, and also told them they might draw any inference from the fact that he was not bound to be sworn, or that he was not sworn, may be doubtful, looking to this language alone.
That he did not so intend, he clearly made known to the jury when his attention was called to it, by the 'exception taken by the prisoner’s counsel, for then, in a special address made by him to the jury upon that point, he correctly instructed them upon the law.
This being a special and separate charge, after the general charge was at an end, if the jury had before obtained a different impression they were clearly set right then.
The only question then left upon this point is, giving the question of doubt as to what was said by the judge on this point in the general charge, in favor of the prisoner, did the correct charge, the plain explanation of his meaning by the judge to the jury, in case they had misunderstood his meaning before, relieve the case from any possible error in that particular. Are we to act upon *294 this review upon the hypothesis that the jury selected by the proper authorities, tried by the court as to their impartiality—a jury satisfactory to the parties for their capacity and indifference, were so stupid in point of intelligence, or so confirmed in prejudice, that they did not apprehend or duly understand, consider or regard the last separate and distinct and special charge of the judge on this point %
Even the case cited by the prisoner’s counsel upon this point, of Crandall v. People (2 Lans., 309, 312, 313), does not sustain their view, but the reverse.
The counsel for the prosecution in that case had improperly discussed the point that his omission to be sworn was against the prisoner.
The court then ruled that no inferences or presumptions could be drawn against the prisoner, because he was not sworn as a witness in the case, but said the court could not prescribe rules for the argument of counsel; to which the prisoner’s counsel expected.
The prosecuting counsel did not further allude to the subject, and the court at general term, held that the court below was in error in supposing they could not prescribe such a rule for counsel, but that the correct charge of the court made upon the objection being taken, rendered the comment of the counsel harmless.
A few cases are found in the books in civil cases where a judge on a trial has admitted improper evidence to go to the jury for their consideration, and though in his charge he directed them to disregard the evidence, it has still been held to be error) Among these is the case of Erben v. Lorillard, 19 N. Y., 299. I think such a case is easily distinguished from one in which, while a judge is charging a jury and what he has said to them or intended to say, in his charge, is brought to his notice as error ; and in the presence of the jury and in a special direction to them, in that regard, he explains Ms meaning, or corrects what *295 may have been understood as his meaning otherwise, as the law, or as matters of fact for their consideration. Conceding that an erroneous charge, or a charge in contravention of the spirit and intent of the statute, is injurious, yet when this is only a presumption, and that presumption is clearly repelled upon the face of the record itself, it is not a case for a reversal.
If it shall be held that every conviction shall be set aside where a judge in a charge to the jury has made a slip of the tongue, or has employed language that is capable of two constructions ; and if in such case it shall also be held that the judge is without power, afterwards, to improve, correct or explain his meaning when it is called in question, to the same jury to whom it is uttered, convictions will be few, and a general carnival of murderers, burglars and other felons may be anticipated.
Few judges will be found who possess in such perfection the powers of rhetoric that in a prolonged charge some single expression may not escape him, that is capable of different meanings, or as possessing a meaning not intended.
If no subsequent explanation can be allowed to correct an ambiguous or doubtful expression, by the judge, then all that is needed in order to escape j ustice, is a skillful watch for accidents or imperfections of expression from the judge, which he will possess no power to correct.
The jury, in this case, upon a fair and impartial trial, where there has been a succession of rulings in the admission and rejection of evidence in all questions of doubt, in favor of the prisoner, have found him guilty of murder in the first degree.
This is a verdict fully justified by the evidence. The prisoner, himself not only versed in the law, had also the assistance of learned, able, skillful, and faithful counsel. But his guilt is clear, and his conviction *296 just. We do not see it to be our duty upon the law to reverse the finding, for any defect of the forms of law.
Miller, J.
The counsel for the prisoner claims that the verdict of the jury was erroneous and wrong, and not warranted by the evidence or the law applicable to the case.
This position is based upon the ground that the deceased, at the time, was with his companion and associate, engaged in an attempt unnecessarily to kill one of the persons who had participated in the burglary, and that the killing was done in resisting such attempt, which, it is insisted, at most, rendered the prisoner guilty of manslaughter (2 Rev. Stat., 661, § 11).
The question whether the deceased was unnecessarily engaged in an attempt to kill, must, I think, be regarded as a question of fact for the consideration of the jury upon the trial, and appears to have been fully and properly presented to them by the judge in his charge.
The uncontradicted testimony shows that the store had been burglariously entered, and some of the property which it contained had been prepared for removal.
The two clerks who were there were suddenly awakened and confronted by the perpetrators of the crime. The burglars stood around their bedside disguised, armed, and the circumstances clearly indicate, with a deadly intent, as human life was taken.
Burrows and Mirrick made resistance, • as they had a lawful right to do, and although two of the burglars had fled, they were justified, I think, in defense of the property committed to- their charge,"to use sufficient force to protect it; and if, as it would seem, there was reasonable ground to believe, as the subsequent facts indicate, that their lives were in danger, to use means to protect them.
*297 Homicide is justifiable when committed by a person in resisting an attempt to murder such person, and in lawful defense of such person when there shall be reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and there shall be imminent danger of such design being accomplished (2 Rev. Stat., 660, § 3).
Can it be said there was no such attempt or design, when a burglary had been committed, and when a human life was actually taken % The inevitable inference to be drawn from the circumstances which attended this crime by those who were assailed by the criminals who had perpetrated it, was, that they intended to commit a felony, and in carrying out their purpose, when detected and likely to be exposed and arrested, were willing to take human life. »
It would, in my opinion, be giving a license to those who commit felonies of this character, to hold that under such a state of facts, the party assailed was bound to wait and discover some other manifestation of a criminal intent, before resorting to such means as lay in his power to protect his person and property.
It may also be remarked, that the fact of assailing the burglar in the manner described by the witness, by no means indicates an intent to kill, and may merely have been designed to disable him and protect, the clerks from assault and injury. But this, with the question of intent to take life unnecessarily, were proper considerations for the jury.
The charge of the judge on this subject, and his refusals to charge as requested, were in accordance with these views, and I think were not erroneous in any respect.
It is insisted that the judge erred in that, portion of his charge to the jury in which he stated that “the prisoner, if he was present, has not, been sworn, and Burrows is the only person who relates the incidents of that night.”
*298 Also, in those portions of the charge in which he says “all these things are proper subjects of consideration by you; ” and “it is true the prisoner is not bound to be sworn.”
Also in saying “but all these things you have a right to consider, and draw your inference from. them. ’ ’
The counsel for the prisoner claims that these portions of the charge were calculated to mislead the jury, and to defeat the object of the act of the legislature, which provides that in trials and other proceedings for criminal offenses, the person charged shall, at his own request, but not otherwise, be deemed a competent witness ;. but neglect or refusal of any such person to testify, shall not create any presumption against him (Laws of 1869, ch. 678, § 1).
The first part of the charge excepted to was said in commenting upon the testimony, as to the person who fired the shot which caused the death of Minick, and the remark made was simply a statement in regard to this branch of the case, which, I think, might very . properly be made without conveying. the impression that an unfavorable inference was to be drawn by the jury from the fact stated.
It is really a part of the res gestee, which could not well be presented without incorporating this fact, and it is evident that there was no intention, on the part of the judge, to create any wrong impression in the minds of the jury by the language employed.
The subsequent remarks were made after the judge had stated that certain circumstances, which bore against the prisoner, were proper subjects of consideration by the jury; and after saying that the prisoner was not bound to be sworn," he remarked: “ It is true the prosecution is bound to make out their own case, and must satisfy you that by evidence on their own part,” &c., and then added the words, which include the last portion excepted to.
I think that neither of the observations of the judge *299 was calculated to convey any erroneous impression on the minds of the jury.
When the judge said that the prisoner was not bound to be sworn, he merely stated the law applicable to this branch of the case, which of itself could not be regarded as prejudicial to the prisoner, and perhaps might be considered as exonerating him from any unfavorable inference arising from the fact that he had not been sworn.
And when the judge said that the jury had a right to consider these things, and draw their own inferences, I do not understand that he meant to refer to the remark that the prisoner was not bound to be sworn, but alluded to what he had previously said (before he stated what the law was), were to be considered. The expressions, prior and subsequent to the matter excepted to, are almost precisely alike, and the jury were to consider these things, that is, the circumstances which he had stated as bearing on the question, and not the law, which did not require the prisoner to be sworn. This interpretation of the charge was made by the judge when the exception was taken, as is evident from the remark made, that “I supposed those remarks were in your favor, but you have a right to except to them—and by an additional charge to the jury to the effect that, “there is no law requiring the prisoner to be sworn, and there is no inference to be drawn against him from the fact of his not being sworn.’ ’
The cases cited by the defendant’s counsel in support of this point do not, I think, uphold the doctrine that there was error in the charge. In Crandall v. People, 2 Lans., 309, the court held that it was error if the court, against the objection of the prisoner, permitted the counsel for the prosecution, in addressing the jury, to comment on the omission of the prisoner to be sworn, as a circumstance against him, or a, fact to be considered in determining the case ; but as no comments were made after the objection was taken, the *300 conviction was sustained. As we have seen, in the case at the bar, the comments made cannot be regarded as injurious to the prisoner, and therefore the case cited does not affect the question involved. ■
The other cases referred to, relate to questions which do not arise here, and I think have no direct bearing upon the point discussed.
It may, perhaps, be said that the judge had a right to correct and explain the charge excepted to, as was done. But independent of this view of the matter, I - think it is not liable to a construction, unfavorable to the prisoner.
There was no error in that portion of the charge where the judge commented upon the construction to be placed upon the motives of those who commit the crime of burglary. It is undoubtedly true, and the judge was right in saying, that they were not entitled to the benefit of the most innocent and merciful construction of their motives.
Those who take the law into their own hands, and depredate upon the property of others, by committing the most heinous offenses known to the law, with weapons of death at their command, cannot claim certainly that their motives are innocent and are entitled to a merciful consideration.
It was competent, I think, for the prosecution to prove a combination or conspiracy between the prisoner and the other persons alleged to have been engaged in the burglary.
So also the testimony relating to the identification of Jarvis and Davenport, by means of the photograph and the use of the stereoscope was properly received.
The question as to the identity of the'prisoner was a question of fact for the consideration of the jury, and the testimony relating thereto was properly submitted to them. I have carefully examined the other questions raised by the counsel for - the prisoner, and am of the opinion that none of them are well founded.
*301 There was no error upon the trial, and the judgment must be affirmed.
Judgment affirmed.
III. March, 1871, the cause was carried by writ of error to the court of appeals.
George Becker and C. L. Beals, for plaintiff in error.
M. B. Champlain, attorney-general, for defendants in error.
By the Court.—Allen, J.
The jury have, by their verdict, found that the homicide was committed either by the accused in person, or by some one acting in concert with him in the commission of a felony, and in the prosecution and furtherance of a common purpose and design.
It must be assumed from the finding of the jury that the prisoner was one of the three persons who burglariously entered the store on the night of the homicide; that Mirrick was killed by one of the burglars in pursuance of the common intent of all, and that the accused either fired the shot which caused the death, or was present, aiding and abetting his confederates in the commission of the act. The presumption from the evidence, assuming that the witnesses and their statements are credible, as the jury seem to have believed is, that the accused in person committed the homicide, and it is not improbable that, had the jury been left to pronounce upon his guilt or innocence upon that theory alone, without the complications resulting from the' submission of the questions touching his responsibility for the acts of any other by whom the deed might have been perpetrated, the result would have been the same. There were but three persons other than the deceased and his fellow clerk present—one of whom was dis *302 abled and lying upon the floor seriously wounded, and the other was in the grasp of Mirrick, the deceased, and was also wounded and injured; the third came up the stairs and fired the pistol which caused his death, and he as one of the three was uninjured and unwounded. The accused, when arrested a day or two after the occurrence, bore no mark of injury upon his person, and could not have been one of the two so badly injured in the encounter with the clerks. It follows that he was either not present and has therefore been wrongfully convicted, or his hand discharged the pistol which caused the death of Mirrick. But the. jury may have taken other views .of the evidence under the charge, so that the questions made upon the trial presented by the writ of error, upon the rule governing the liability of one to answer criminally for the acts of others cannot be passed by without consideration.
. If the homicide was committed by one of several persons in the prosecution of an unlawful purpose or common design, in which the combining parties had united, and for the effecting whereof they had assembled, all were liable to answer criminally for the act, and if the homicide was murder, all were guilty of murder, assuming that it was within the common purpose. All present at the time of committing an offense are principals, although only one acts, if they are confederates and in a common design of which the offense is a part (Russ. on Crimes, 27, 29). The several persons concerned in this offense were assembled for the commission of a felony, and were engaged in the actual perpetration of the offense, and the homicide was committed upon one who was opposing them in the act, and in rescuing and aiding the confederates to escape. To this conclusion the jury must have come.
If there was a general resolution against all op-posers and to resist to the utmost aH attempts to detain *303 oí hold in custody any of the parties, all the persons present whén the homicide was committed were equally guilty with him who fired the fatal shot (Russ. on Crimes, 29, 30). This general resolution of the confederates need not be proved by direct evidence, it may be inferred from circumstances—by the number, aims and behavior of the parties at or before the scene of action (Ib.; Fost., 353, 354 ; 2 Hawk. P. C, ch. 29, § 8 ; Tyler’s Case, 8 Carr. & P., 616). There was enough in this case to authorize the submission of the question to the jury.
An express resolution against all opposers can very seldom be proved by direct evidence, but here every circumstance tended strongly to prove it.
Some of the confederates, and perhaps all, were armed; they actually did resist all opposition with such weapons as they could successfully use. When one was detained, being overcome by the opposition, the others returned at the call of their comrade, and the only one in condition to do so, deliberately shot Mirrick, who was preventing the escape of one of the confederates, and was cautioned by that confederate, when about to shoot, not to shoot him. The jury were authorized to infer that this act was within the general purpose of the confederates. They may have desisted from their larcenous attempts, and yet the full purpose of the combination not have beeil carried out so long as one of the party was detained and held a prisoner.
The charge of the judge was favorable to the accused, upon this branch of the case; fully as favorable as the law would warrant. It was in substance, that if the shot that caused the death was fired by another hand than that of the prisoner, the jury must be satisfied that there was an actual and overt concert and complicity to effect that precise object. Again, the judge charged in response to a request of the prisoner’s counsel, that the jury must be satisfied that the prisoner had fired the *304 fatal shot which produced the death of Mirrick, or that he (that is, the person actually shooting), was acting under the influence of a purpose common to all for the promotion of a bad cause, that the others were co-conspirators with him, and that they had the same object in view and that the same purpose actuated the breasts of all, before they could find the prisoner guilty of murder; and the same was in substance repeated in another part of the charge. But a charge in the terms of the request would have been improper. The request was to charge that the common guilty purpose of resisting to the death any person who might endeavor to apprehend them must have been formed when the parties went out with a common illegal purpose of larceny. The time when the illegal combination and arrangement was made which resulted in murder, is not material, so long as it was made before the actual commission of the offense. They may have only had a larceny in their minds when they left Hew York, the other intent may have been formed after they reached Binghamton, or after they entered the premises.
After the judge had charged as before stated, and in response to the request of the prisoner’s counsel, had charged : 1. That to authorize a conviction for murder in the first degree the shot must have been fired with a premeditated design to take life, not simply to rescue his companion. 2. That if all the person who fired the shot, did, was intended to render help, and to rescue his endangered companion, and not simply to kill, there could be no conviction of murder. And, 3. That if the acts of Murick, and the circumstances as they transpired and which were referred to in detail, and the situation and condition of the confederates, and the desire to avoid detection and arrest of any of the burglars, or their death at the hands of Mirrick, aroused and heated the blood of the one who fired the fatal shot, the prisoner could not be convicted of murder ; he was *305 asked to charge that if the prisoner and his companions on the occasion of the homicide entered upon the premises, with the common purpose of larceny, and the violence of the prisoner’s companion was merely the result of the situation in which he found himself, and that he proceeded from the impulse of the moment, without any concert, then the prisoner would be entitled to an acquittal and discharge.
He had in various forms charged his proposition in substance, and had gone to the very verge of the law in favor of the accused, and explained the principles upon which, and upon which alone, he could be convicted of murder for the acts of his companions and confederates, and he was not called upon to repeat the instructions in as many forms and with all the varieties of diction that counsel could devise. Having once distinctly and without ambiguity enumerated the legal propositions, it was not error to decline a repetition. We are not called upon to decide whether the prisoner was entitled to rulings as favorable as those given. Be that as it may, the judge was not bound to adopt the words of the counsel, having stated the proposition substantially as requested by counsel (First Baptist Ch. in Brooklyn v. Brooklyn Fire Ins. Co., 28 N. Y., 153 ; Fay v. O’Neill, 36 Id., 11).
The claim pressed with the most earnestness in behalf of the plaintiff in error is that the offense was reduced to manslaughter in the second degree, as having been committed in resisting an attempt of the deceased to commit a felony, the attempted felony, as claimed, being the unnecessary killing of one of the burglars by Mirrick and his fellow clerk. The statute declares that every person who shall unnecessarily kill another, while resisting an attempt to commit any felony, or to do any other unlawful act, shall be deemed guilty of manslaughter in the second degree (2 R. S., 661, § 11). The prisoner claims that the killing of Mirrick was within *306 the provisions of this act. That the prisoner and Ms confederates were engaged in the commission of a felony, and that the deceased could lawfully use all the force necessary to oppose and prevent the consummation of the felony, could properly resist all attempts to inflict bodily injury upon himself, and could lawfully detain the felons, and hand them over to the officers of the law for prosecution and punishment, is not denied, and it would only be by the use of unnecessary or wanton violence, and the infliction of unnecessary and wanton injury to the person of the criminals, that the deceased could become a wrongdoer. Without undertaking to define the boundary line which separates the lawful and authorized from the unauthorized and illegal acts of individuals, in the protection of property, the prevention of crime, and the arrest of offenders, it is enough that the law will not be astute in searching for such a line of demarkation as will take the innocent citizen, whose property and person are in danger, from the protection of the law, and place his life at the mercy and discretion of the admitted felon. They will not be made to change places upon any doubtful or unnecessary state of facts.
The prisoner’s counsel requested the judge to charge the jury, that if the killing of Mirrick was necessary in order to prevent him from unnecessarily killing another, it was not murder in the first degree. The request was properly declined. There was no evidence to warrant the submission of the question to the jury. The claim upon the argument was, that the burglar who was first seized by Burrows, and struck and severely injured, both by Mm and the deceased, was in danger of being killed at the time of the homicide, and that it was to save the life of this man that the deceased was killed. But the evidence is, that both Mirrick and Burrows had left this burglar before either of the others returned to the rescue, and that neither was then harming or attempt *307 ing to harm him. It could not have been, then, to prevent the unnecessary killing of that man, that the life of the deceased was taken. At the time of the homicide, the deceased was struggling with the second burglar, and having him at some advantage, but there is no evidence that he was doing or attempting to do him any bodily harm. Who made the first attack, or that the deceased was doing anything except to defend himself, or possibly to detain the man in custody and prevent his escape, does not appear. The killing was deliberate, and for some purpose other than the prevention of a felony by the deceased. A verdict that the killing was to prevent the unnecessary killing of the person then struggling with the deceased, would have been unsupported by evidence. There was no error in the refusal to charge as requested. A question is presented by the exception to the comments of the judge upon the fact that the prisoner had not availed himself of the privilege of being sworn and giving evidence in his own behalf. Persons upon trial for crime may, at their own request, but not otherwise, be deemed competent witnesses. If sworn, his testimony will be treated as of but little value, will be subjected to those tests which detract from the weight of evidence given under peculiar inducements to pervert the truth when the truth would be unfavorable, and he will, under the law, be subjected to the cross-examination of the prosecuting officer, and made to testify to any and all matters relevant to the issue, or his own credibility and character. He will be examined under the embarrassments incident to his position, depriving him of his self-possession, and necessarily greatly interfering with his capacity to do himself and the truth justice. These embarrassments will more seriously affect the innocent, than the guilty and hardened in crime. If, with this statute in force, the fact that he is not sworn can be used against him and suspicion be made to assume the form *308 and have the force of evidence, and circumstances, however slightly tending to prove guilt, be made conclusive evidence of the fact, then the individual is morally coerced, although not actually compelled to be a witness against himself. Neither the prosecuting officer or the judge has the right to allude to the fact that a person has not availed himself of this statute, and it would be the duty of the court promptly to interrupt a prosecuting counsel who should so for forget himself and the duties of his office as to attempt to make use of the fact in any way to the prejudice of a person on trial. An allusion by the judge to the fact unexplained cannot but be prejudicial to a person on trial. It is an intimation to the jury of the effect upon his mind of the neglect of the accused to explain by his own oath, suspicious and doubtful facts and circumstances, as affecting the question of guilt or innocence.
"The judge alluded to the fact that the accused was not sworn, twice in the course of his charge; once in connection with the question of identity and the narration of the circumstances of the homicide, and again in connection with the circumstances claimed to be suspicious as tending to prove the prisoner at the burglary and his connection with the other supposed burglars, and in both occasions in a manner calculated to give an impression prejudicial to the prisoner, inasmuch as he had not contradicted the former or explained the latter. It is true the judge told the jury that the prisoner was not bound to be sworn, and that the prosecution must make out their case, but he did not say in that connection that his omission to be a witness should not create any presumption against him. Had not this been subsequently, and upon an exception being taken, explained, it would have been just ground for complaint by this prisoner.
But the judge, upon his attention being called to his remarks, did say to the jury that there was no law requiring the prisoner to be sworn, and there was no *309 inference to be drawn against him, from the fact of his not being sworn.
Inasmuch as the error of this part of the charge was that by its general terms it authorized an inference to the prejudice of the prisoner, rather than a direct statement of an erroneous proposition, we are of the opinion that the error was cured by the subsequent explanation.
Objection was made upon the trial to .the production in evidence of certain implements and papers found in the room and desk of the prisoner. Both the room and desk were used somewhat in common by him and one of his associates, but he was the chief occupant. The articles were taken sometime after this arrest, and evidence was given tending to show that he had the key of the room, and showing how the room had been kept during his absence, and the prisoner upon the trial admitted the possession of one of the implements.
Other evidence was given also tending to connect the prisoner with the articles found in his room, and the question of fact was properly submitted to the jury as to the connection of the prisoner with these articles upon all the evidence. The ratchet'drill, which it was claimed the bits with which the entry into the store was effected fitted, the prisoner admitted on the trial had been in their possession as a new invention and a curious thing. This alone was some evidence that the articles found with the drill were there while the prisoner occupied the room and used the desk, especially with the other evidence tending to show that the room had remained locked from the time he lefi until the articles were found and taken away.
Objection was also taken to the admission of the photographic likeness of the two persons found drowned. Evidence was given of the manner in and disadvantageous. circumstances under which they were taken, and that they were not the most perfect likenesses that *310 could be taken. This was fully explained by the artist.
They were submitted to the witnesses not as themselves, and alone, sufficient to enable them to identify the prisoner with entire certainty, but as aids and with other evidence to enable the jury to pass upon the question of identity.
They were the best portraits that could be had, and all that could be taken. The persons were identified by other circumstances, the clothes they wore and the articles found upon their persons, and their general description, and the photographs were competent, although slight evidence in addition of the other, and more reliable testimony. We are of the opinion that it was not error under the circumstances to admit them as evidence for what they were worth. By themselves they could have been of but little value, but they were of some value as corroborating the other evidence identifying the bodies. There was no error of substance committed upon the trial, and the judgment must be affirmed and the proceedings remitted to the court below to proceed upon the conviction and pronounce sentence of death as prescribed by law.
All the judges concurred.
Judgment accordingly.

 Present, Theodore Miller, P. J., Platt Potter, and John M. Parker, JJ.